## CHICAGO MILL & LUMBER COMPANY, Employer *v.* Starline GREER, Employee, and STATE of Arkansas, Second Injury Fund

CA 80-104                                    601 S.W. 2d 583

Court of Appeals of Arkansas
Opinion delivered July 2, 1980
Released for publication July 8, 1980

896

*Daggett, Daggett & Van Dover, by: Jesse B. Daggett*, for appellant.

*Mike J. Etoch, Jr.*, for appellees.

GEORGE HOWARD, JR., Judge. On January 17, 1978, claimant-appellee, a 62-year-old black man, with no formal education — claimant cannot even write his name — while in the course of his employment with appellant, was injured when a log fell on his right foot fracturing his ankle. The fracture required surgery involving the insertion of metal screws to repair the injury.

Claimant's left leg was amputated below the knee in 1938 or 1939 as a consequence of an injury for which he received no compensation.[1]

The Workers' Compensation Commission, in determining claimant's permanent disability and the application of Arkansas' Second Injury Law to such determination, made the following findings of fact:

---

[1]Claimant's affidavit dated May 31, 1979, states:

" 'I was cutting timber for the Shannon Brothers in Mississippi around 1938 or 1939, when a tree fell on my left leg and crushed it. I did not receive any compensation for same; I even had to pay my own medical bills.' "

1. That as a result of the combined effect of the non-job-related amputation of his left leg and the 40 percent impairment to his right leg resulting from the compensable injury of January 17, 1978, the claimant is permanently and totally disabled.

2. That payments from the Second Injury Fund as per Section 13(f)(2)(iii) are not applicable to this claim.[2]

3. That the non-job-related amputation of the claimant's left leg below the knee prior to the compensable injury of January 17, 1978, independently produced some degree of disability before the accident and continues to operate as a source of disability after the accident; ;and that the respondent, Chicago Mill & Lumber Company, is entitled to a credit of $10,500.00 under the Rule of Apportionment for the non-job-related amputation of the left leg and is based upon 125 weeks at $84.00 per week.

4. That respondents' total liability for all weekly compensation benefits to the claim under Finding of

---

[2]Ark. Stat. Ann. § 81-1313(f)(2)(iii) provides:

(f) Second injury: In cases of permanent disability arising from a subsequent accident, where a permanent disability existed prior thereto:

. . .

(2) If an employee has a prior permanent total disability not occasioned by an injury resulting while in the employ of the same employer in whose employ he received a subsequent permanent injury, the amount of compensation for the subsequent injury shall be fixed as follows:

. . .

iii. If an employee who had previously incurred permanent partial disability through the loss of one [1] hand, one [1] arm, one [1] foot, one [1] leg, or one [1] eye, incurs permanent total disability through the total loss of another member, enumerated in this sentence, he shall be paid, in addition to the compensation for permanent partial disability provided in Section 13(c) (subsection (c) of this section), additional compensation during the continuance of such total disability at the rate prescribed in Section 10 [§ 81-1310] of this Act applied at the time of the accident which produced the total permanent disability.

Fact No. 3 amounts to $39,500.00 and represents 470.24 weeks at $84.00 per week; and that after respondents have paid weekly benefits which amount of $39,500.00, further benefits due the claimant for total disability shall be paid from the Death and Permanent Total Disability Bank Fund.

In explaining the Commission's posture in fixing the employer's share at $39,500.00 for claimant's disability — the Commission apportioned claimant's share at $10,-500.00 — the Commission stated:

"As per Section 10(c)(2) of the Act, the respondent's total disability for weekly benefits in this case is $50,000.00. The claimant, prior to his compensable injury of January 17, 1978, suffered a non-job-related amputation of his left leg below the knee which would have entitled him to 125 weeks of compensation if the amputation had been the result of a compensable injury. There is no evidence in the record as to when the amputation occurred, or the amount of the claimant's earnings at the time of the amputation. In view of the lack of evidence concerning this question, we feel that a fair and reasonable method to determine the credit to be given from the prior injury is to base it on the claimant's earnings at the time of the compensable injury of January 17, 1978. The claimant's compensation rate for the injury of January 17, 1978, is $84.00 per week, and 125 weeks at $84.00 per week for the amputation of the left leg below the knee will give the respondent, Chicago Mill & Lumber Company, a credit of $10,500.00.

"Since the maximum total liability of the respondent, Chicago Mill & Lumber Company, is $50,000.00, and giving them a credit of $10,500.00, for the non-job-related amputation of the claimant's left leg, will leave a balance to be paid by the respondent, Chicago Mill & Lumber Company, of $39,500.00 or 470.24 weeks at $84.00 per week."

Appellant argues that the Commission erred in ruling that the second injury fund was not applicable in this proceeding.

In *Arkansas Workmen's Compensation Commission* v. *Sandy*, 217 Ark. 821, 233 S.W. 2d 382 (1950), the Arkansas Supreme Court made the following relevant comment in sustaining the Commission's holding that the claimant was not entitled to payment from the "Second Injury Fund":

> "This court has held that the degree of disability suffered by an injured employee is a factual question to be determined from the evidence in the case."

The Supreme Court commented further in *Sandy* by quoting from the opinion of the Commission:

> " 'This fund, called the 'Second Injury Fund', is a limited and restricted fund and is created specifically for the benefit of those employees who are found to be totally and permanently disabled and who strictly comply with the provisions and requirements of § 13(f)(2)(iii). While Workmen's Compensation Acts are generally to be liberally construed the solvency of this special 'Second Injury Fund' requires that the provisions and requirements thereof be fully and strictly complied with. In our opinion, the 'loss of a member or organ', or the 'loss of use of a member or organ', as is provided for in § 13(f)(2)(iii) means the total loss or total loss of use. To hold otherwise would open this special fund to the point of insolvency and provide no benefit to those who do comply with its provisions and who are entitled to benefits thereunder.' "

Dr. Harold H. Chakales, claimant's physician, submitted a medical report dated October 17, 1978, which reads:

> "At this time, I feel that Mr. Greer has reached maximum healing and that he carries a physical impairment of approximately 35-40% of the right lower extremity."

Dr. Richard M. Logue, who examined the claimant at the request of the employer, stated in his medical report dated August 18, 1978:

> ". . . I would anticipate that his disability relating

to this injury would be in the magnitude of possibly 15 percent to the right leg below the knee."

The claimant testified with reference to his right leg: ". . . I can't stand up on it no more, because I tries it . . ."; that he has tried to resume work on three occasions, but was "told to go back home" after working about an hour with his crutches when his foot started swelling and paining; and that his left leg is a wooden leg.

Upon this evidence the Commission found that claimant's impairment to his right leg was 40%, and, accordingly, he has not sustained a total loss of use required under the statute governing the second injury fund.

We hold that there is substantial evidence to support the holding of the Commission.

Appellant also argues that the Commission "erred by apportioning the specific value of the pre-existing injury ($10,500.00) rather than the effect of the pre-existing injury upon the ultimate liability, $45,800.00." In other words, appellant is ultimately liable only for the amount of disability attributable to the injury of January 17, 1978 — the 40% impairment of claimant's right leg, an award of 50 weeks at $84.00 per week or $4,200.00. "Any additional award resulting from the effect of the pre-existing injury and therefore that portion ($45,800.00) should be apportioned."

Under Ark. Stat. Ann. § 81-1310(c)(1)(2) (Repl. 1976), appellant's total liability for claimant's permanent total disability[3] for weekly benefits is $50,000.00. The Commission, having found that claimant's pre-existing impairment independently produced some degree of disability before the compensable injury as well as after the injury, concluded that claimant's pre-existing disability resulting from the non-job-related amputation of his left leg should be apportioned.

Inasmuch as there was no evidence in the record specify-

---

[3]It has been conceded by the parties in this proceeding that claimant is totally and permanently disabled.

ing the exact date that claimant's left leg was amputated or the amount of the claimant's earnings at the time of the amputation, the Commission concluded that a fair and reasonable method for determing the credit to be given for the pre-existing injury was to base the calculation on claimant's earnings at the time of his compensable injury of January 17, 1978, and apply the schedule for such a member contained in Ark. Stat. Ann. § 81-1313(c). A credit of $10,-500.00 was applied against appellant's liability of $50,000.00, thus requiring appellant to pay $39,500.00 or 470.24 weeks at $84.00 per week. At the end of this period, further payments due claimant for his total disability would be made from the Death and Permanent Total Disability Bank Fund.

The effect or the contribution of a pre-existing injury, when combined with a present compensable injury resulting in permanent total disability, as in the instant case, is seldom susceptible of exact proof. This determination must be left principally, if not entirely, to the discretionary estimate of the Workers' Compensation Commission which is endowed with the responsibility to develop the State's policy in industrial injury cases. *Southeastern Construction Company, et al* v. *Dependent of S. W. Dodson, Deceased,* 153 So. 2d 276 (Miss. 1963); *Bill Williams Feed Service* v. *Mangum,* 183 So. 2d 917 (Miss. 1966). The question involving a worker's total disability is to be determined as a question of fact. *Eddie McNeely* v. *Clem Mill & Gin Company et al,* 241 Ark. 498, 409 S.W. 2d 502 (1966); *Arkansas Workmen's Compensation Commission* v. *Sandy,* supra.

Prior to claimant's compensable injury on January 17, 1978, claimant was fully employed, engaged in heavy manual labor involving mill work, his job assignment required a considerable amount of standing and walking and it is clear that claimant performed satisfactory service at Chicago Mill over a relatively long period of time in spite of the fact that he had a wooden leg. Indeed, the Commission was free to consider these factors and any inferences derived therefrom in making the apportionment in this case. We are unable to perceive, and the appellant has not demonstrated, any abuse of the Commission's discretion or manifest errors on the part of the Commission in making the apportionment in this proceeding.

Total disability, within the meaning of the Workers' Compensation Law, does not mean merely functional disability, but includes the varying degrees in each instance, loss of use of the body to earn substantial wages. *Glass* v. *Edens*. 233 Ark. 786, 346 S.W. 2d 658 (1961). Balancing of functional factors and loss of use of the body to earn substantial wages is a responsibility of the Commission. *Mann* v. *Potlatch Forrests*, 237 Ark. 8, 371 S.W. 2d 9 (1963).

The Supreme Court made the following relevant comment in *Rooney & Travelers Insurance Co.* v. *Charles*, 262 Ark. 695, 560 S.W. 2d 797 (1978), Justice, now Chief Justice, Fogleman, speaking for the Court:

> "We have long recognized that the wage-loss factor, i.e., the extent 'to which a compensable injury has affected a claimant's ability to earn a livelihood,' rather than the functional or anatomical loss, is generally controlling in disability determinations, which are to be made by the Workmen's Compensation Commission on the basis of medical evidence, age, education, experience and other matters reasonably expected to affect the claimant's earning power. . . ."[4]

Finally, appellant contends that if the Second Injury Fund is not liable and appellant is required to pay benefits in excess of the scheduled allowance for the 40% impairment to claimant's right leg, $4,200.00, handicapped employees may be discharged when their employers adjust their work force to miminize their exposure.

Appellant's argument is neither persuasive nor impressive, for studies have established that handicapped workers have a lower accident rate than workers in possession of their full functions. *See: Encouragement of Employment of the Handicapped*, 8 Vand. L. Rev. 575 (1955). Moreover, emphasis is now placed on the rehabilitation of employees who have sustained permanent disability in industrial accidents. *Rehabilitation Within The Worker's Compensation Framework*, 19 Rutgers Law Review 401 (1965). Arkansas's Rehabilitation

---

[4]As a direct consequence of claimant's compensable injury of January 17, 1978, his earning capacity was reduced from 100% to zero.

Law, Ark. Stat. Ann. § 81-1310(f) is perhaps one of the most objective pieces of legislation designed to cope with the problems involving disabled or handicapped employees.

Moreover, the history of claimant's performance as an employee, over the years, as well as Chicago Mill's conduct after claimant was discharged by his physician, refutes appellant's argument. After claimant had reached the maximum healing period, appellant returned claimant to his former work assignment even though claimant was even more handicapped than before. It is clear that claimant was a dependable, conscientious and dedicated employee. To limit claimant's recovery can likewise cast a deleterious effect on the efforts of the Commission and employers alike endeavoring to promote the rehabilitation of the handicapped. Needless to say, a reversal of the Commission in this case will have the effect of penalizing a handicapped employee who has sought to improve himself economically without relying solely on social agencies for assistance. Indeed, society's attitude and thinking about the handicapped in 1980 is more humane and realistic than it was fifty years ago.

Affirmed.

WRIGHT, C.J., and HAYS and NEWBERN, JJ., dissent.

DAVID NEWBERN, Judge, dissenting. The appellant asks only that the apportionment of its liability be done in a fair manner. The prevailing opinion (there is no majority in this case) affirms apportionment by the workers' compensation commission in a manner I view as being grossly unfair to the appellant.

There is no direct statutory authority for apportionment of liability for total disability. However, the Arkansas Supreme Court has approved the doctrine of apportionment, at least in cases where it is necessary to divide responsibility between two employers. *International Paper Company* v. *Remley*, 256 Ark. 7, 505 S.W. 2d 219 (1974).

In the *Remley* case Justice George Rose Smith's opinion dealt with an employee who had sustained a 20% permanent

partial disability of the hand before going to work for the appellant-employer. He thereafter sustained an additional 15% permanent partial disability to the same hand a a result of a compensable injury. The commission's decision, which was affirmed by the circuit court, awarded compensation against the employer for the entire 35% disability on the theory that apportionment would be contrary to the general purposes of the act. The supreme court reversed that holding. Justice Smith said:

> . . .[W]orkers as a whole will not always benefit in the long run by a rule of non-apportionment that makes an employer liable for the total consequences of a second injury, as if the first injury had not occurred. Such a rule might easily make it hard for the victims of a first injury to find re-employment.

> . . .

> . . . [T]he fact that Remley's 1934 injury did not result in a loss of earning capacity is not of paramount importance, because the act provides a fixed schedule of payments for an injury to the hand. Secondly, a rule denying apportionment as between two injuries is not necessarily a desirable one for all workmen.

The overall benefits to be obtained by apportionment were also noted in *Corbit* v. *Mohawk Rubber Co.*, 256 Ark. 932, 511 S.W. 2d 184 (1974), and *Wooten* v. *Mohawk Rubber Co., et al.*, 259 Ark. 837, 536 S.W. 2d 734 (1976). *Cf., O.K. Processors* v. *Dye*, 241 Ark. 1002, 411 S.W. 2d 290 (1967).

We cannot tell what formula the court would have used for apportionment in the *Remley* case had there been total disability. The appellant-employer there contended it was responsible only for 15% disability suffered in its employ. The ultimate statement in the portion of the opinion dealing with this problem was as follows:

> Therefore the appellee's recovery for the functional loss caused by the second injury cannot under the statutory language [Ark. Stat. Ann. § 81-1313 (f) (2)i. (Repl.

1976) ], include the functional loss caused by the first injury.

The sentence quoted above refers to § 81-1313 (f) (2)i. That subsection applies only in instances where there has been a second injury to the "same member." Subsection (f) (2)iii provides that "[i]f an employee who had previously incurred permanent partial disability through the loss of one . . . leg . . . incurs prmanent total disability through the total loss of another member, . . . he shall be paid in addition to the compensation for permanent partial disability provided in § 13(c) . . . additional compensation. . . ." The "additional compensation" is to be taken from the second injury fund which is not available in this case.

Thus, the legislative apportionment policy our supreme court found in the *Remley* case is equally prevalent in cases of total disability resulting from *total loss* of a second member resulting in total disability. It should apply here also, even though the total disability results from less than total loss of the second member. Despite the lack of specific statutory language, the legislative policy clearly is that the employer should not be responsible for a disabling, scheduled injury an employee sustained before going to work for the employer in question. A logical extension of that premise is that an employer should also not be responsible for that portion of total disability attributable to the previous injury.

The prevailing opinion affirms the commission's decision, including that portion which recognizes that, at the end of the employer's apportioned responsibility, further payments due the claimant for his total disability will be made from the Death and Permanent Total Disability Bank Fund. *Ark. Stat. Ann.,* § 81-1310(c)(2) (Supp. 1979). This, of course, is an appropriate recognition that it should make no difference to the claimant in this case whether he is compensated by his employer or his employer's carrier or the Fund. And yet, near the conclusion of the prevailing opinion, there are references to limiting the claimant's recovery and "penalizing a handicapped employee," suggesting that an apportionment of any of the claimant's entitlement would be unfair and "deleterious" to him. These remarks are inconsis-

tent with the action taken by the commission and approved by the prevailing judges.

It is grossly unfair to the appellant-employer to apportion the maximum $50,000 liability so that it bears all of the responsibility for that amount except $10,500. The total disability of the employee was caused by two physical factors. First, the employee lost a leg in an accident which occurred long before he became employed by the appellant. The second factor is the 40% disability incurred to the remaining leg while the claimant was employed by the appellant. To say that the latter factor is or should be regarded as the major (79%) contributor to the total disability is to ignore reality, even though some factors other than physical may enter into the total disability determination. The prevailing opinion saddles the latest employer with the lion's share of the responsibility even though the physical injury for which he is responsible is by far the lesser of the physical causes of the disability.

As we have no apportionment statute, and as we cannot tell what formula our supreme court might use in a total disability case, it becomes incumbent upon us to devise a formula which will treat the parties fairly and consistently with what we can discern to be legislative policy. In this case the appellant-employer should be wholly responsible for that portion of the total disability which consists of the scheduled disability to the leg injured while the claimant was employed by the employer, i.e., 50 weeks at $84.00 per week or $4,200. As noted above, an employer whose employee sustains total disability in a case where there is no contributing scheduled disability is responsible to the maximum extent of $50,000. Ark. Stat. Ann., § 81-1310(c)(2) (Supp. 1979). By subtracting $4,200 from $50,000 we obtain a remainder of $45,800. That amount should be apportioned between the employer and the Fund.

As the scheduled disability to the remaining leg is 29% of the combined value of the two injuries in accordance with the schedule, [$4,200 equals 29% × ($4,200 + 10,500) ], we should apportion the remaining disability $45,800) by requiring the employer to pay 29% of that figure or $13,282. Thus, the

employer should pay weekly benefits up to a total of $13,282 plus $4,200, or $17,482, with further payments to be made, as the commission held, from the Fund. The use of this formula would effectively apportion both the direct, physical and the other contributing factors in the total disability in accordance with the evaluation of the physical injuries by the statutory schedule.

I would reverse and remand for revision of the commission's order.

Chief Judge Wright and Judge Hays join in this dissenting opinion.